Jason Edward Ochs, WSB: 7-4965
Ochs Law Firm, PC
4305 Balsam Lane
PO Box 10944
Jackson, WY  83001
T:  (307) 234.3239
F:  (307) 235.6910
jason@ochslawfirm.com

### IN THE UNITED STATES DISTRICT COURT
### OF WYOMING

| | | |
|---|---|---|
| DAVID MECARTNEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| TETON MEDIA WORKS, INC. d/b/a | ) | |
| JACKSON HOLE NEWS AND | ) | |
| GUIDE | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff DAVID MECARTNEY ("Plaintiff" or "Father"), by and through undersigned counsel, who hereby files his Complaint ("Complaint") for damages against Defendant TETON MEDIA WORKS, INC. d/b/a JACKSON HOLE NEWS AND GUIDE ("Defendant" or "JH News"), and respectfully shows this Court as follows:

A good name is more desirable than great riches;
to be esteemed is better than silver or gold.  *Proverbs 22:1*

1

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff is a resident of the State of Arizona.

2. Defendant is a corporation incorporated under the laws of the State of Wyoming with its principal place of business in Jackson, Wyoming.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The acts, errors and omissions giving rise to the Plaintiff's claims against Defendant occurred in Wyoming.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within this district, and the Defendant is subject to personal jurisdiction in this judicial district. Specifically, the Defendant, a Wyoming corporation, published defamatory articles at issue from its principal place of business in Wyoming, and these publications were distributed and caused harm within this district.

5. This Court has jurisdiction over the subject matter of this case and over the Defendant.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A. Words Are Power.**

6. On or about May 21, 2025, the Jackson Hole News And Guide published an article authored by Jasmine Hill titled "Words Are Power" (hereinafter, the "Article").

The Article contains numerous false and defamatory statements concerning Plaintiff.

7. Jasmine Hill is, and at all times relevant herein, an employee of JH News.

8. The Article asserted that Dune Mecartney ("Mecartney") and his mother, Kelly Cornell ("Cornell" or "Mother"), "are survivors of child abuse and domestic violence." It further stated that "Mecartney's father, his abuser, is no longer in his life and his mother has full custody of him." The Article quoted Mecartney from a personal website, stating, "The last time I spoke to my father was September 2019, right after he strangled me within inches of my life." It also quoted Mecartney as saying that his mother "thought she was the only victim of her abuser's violence for a long period of time."

9. The Article continued the defamatory narrative, stating, "Mecartney and his mother said they both have overcome many challenges in the last decade. Their experience was challenged after their abuser initially controlled the narrative. They also faced an abuser with significant financial means to fight in court and had to tackle a legal system that doesn't have the right protections in place for people in their position, they said."

10. These assertions were presented as established facts without qualification. In several instances, the defamatory statements were not attributed to a source, such as the claim, "Mecartney's father, his abuser...," which implies a factual determination by the Defendant.

11. The Article's frequent references to the "legal system," "legal battles," "court-ordered," "Teton County District Court," "guardian ad litem," and "court documents" clearly demonstrate the Defendants were aware of the pre-existing, ongoing litigation at the time of publication.

12. Furthermore, the Article cites "court documents" to support the following statement: "Mecartney's father fought his mother for custody and the right to see him. Despite a record of 911 calls, restraining orders and testimony from both Mecartney and Cornell, Mecartney was forced to continue seeing his abuser in 'reunification treatment' therapy until 2022, according to Mecartney, Cornell and court documents."

B. **Defendant's Awareness of Key Contradictory Findings.**

11. The Wyoming Supreme Court's 2021 decision in Mecartney v. Mecartney, 2021 WY 141, and the Teton County District Court's March 11, 2021, Custody Order were public records and available to the Defendants. The Custody Order contains key facts that directly contradict the Article's defamatory statements. These include, verbatim:

    I.   **<u>The Court found no substantiation of physical abuse by Father, stating</u>**:

        a. "The Court finds that no substantiated evidence of child abuse by Father was proven at trial."

        b. "Allegations of physical abuse in this case were not substantiated."

c. "The evidence of child abuse and spousal abuse was limited and not credible."

d. "Both Mother and the child assert child abuse occurred throughout the child's life. Dr. Raju examined the child in response to a specific allegation of abuse. The allegations were not substantiated by her physical examination of the child or her interview of him."

e. "Ms. Gensch, the former household assistant, was trained in early childhood education and had some training in how to identify signs of child abuse. She testified that she never saw signs of abuse between Father and child."

f. "While Mother asserts the child's emotional and mental struggles are related to a history of abuse by Father, that abuse was extensively discussed at trial and not substantiated. Mother refuses to accept that the abuse has not been substantiated. For example, after a report was made to DFS, an investigation followed. When DFS refused to concur that abuse had occurred, Mother responded to DFS with hostility in a lengthy email. When Dr. Raju refused to affirm abuse, Mother and Dr. Raju, who had formerly been friends, became estranged. This Court has seen abuse cases. This case does not have the indicia of child or spousal abuse."

## II.     The Court had *substantial* credibility concerns with Mother:

a. "Mother testified that she has reported child abuse to many individuals and agencies. **Her exhibits and witnesses to corroborate that testimony were lacking.** The Court notes that many of those entities have an obligation to act if there is a credible allegation of abuse. This is true of the child's school, the Community Safety Network, the GAL, the child's therapist, the DFS, the police, Mother's lawyer, the GAL, the custody evaluation and the child's doctors. Dr. Raju affirmatively found no sign of abuse after a physical examination of the child. As discussed above, DFS and law enforcement did investigate the allegation and found no corroboration for Mother's report. **Despite having no evidentiary support for her allegations, Mother's case at trial featured child abuse as a major theme.**"

b. "As a witness however, **Mother lacks credibility in many ways**. The Court raised its issues about credibility in previous orders."

III.  **The Court questioned Mother's mental competency and parental fitness, while Father's was not at issue**:

a. "**Concerns were raised at trial about Mother's mental competence and fitness**."

b. "Dr. Raju also **expressed concern over Mother's mental competency and fitness** after receiving late night texts and emails from Mother that caused her concern."

c. "The GAL **concluded that Mother is not mentally competent to care for the child** appropriately."

d. "The Court also noted Mother's inappropriate actions in a related civil case, Civil Action 18122, including intentionally removing items from an airplane to render it unflyable, reporting alleged health issues about Father to the FAA under the pretense of a self-report, opening Father's mail, and sending messages demanding $300,000 for the plane or stating he would get it "over her dead body." That conduct by Mother resulted in a civil action being filed to restore the items to the airplane to make it legally airworthy.  In her testimony in that proceeding, Mother freely admitted that she took items from the airplane on multiple occasions, to render it unflyable, and she attempted to justify her actions on various bases, **none of which were particularly credible as the Court noted in its order in that case**."

IV.  **The Court found Mother's efforts to alienate and estrange the child from Father:**

a. "The custody evaluator **concluded that Mother has alienated the child from Father** since the parents separated."

b. "**It does not take a particular level of expertise to determine that Mother's interference with the Father-child relationship has been inappropriate and damaging**, resulting in severe estrangement of the Father and child. The

6

videos provided to the Court are alarming. Several of them depict **Mother coaching the child that Father deserves a "fuck you,"** and the child parroting Mother's information about being cut off from credit cards, bouncing checks, being abandoned, being abused and more. The child also parrots Mother's statements and beliefs that Father is an alcoholic and an ungodly person."

c. "Mother's conduct that has **estranged the child from his Father** and negatively affected the child has been **undeniably disturbing**."

**V.     The Court Ordered Joint Legal Custody and eventual Shared Custody:**

a. "The Court found that it was in the **best interest of Mecartney that the parents have joint legal custody, with a shared custody arrangement** after therapeutic transition between Father and child."

12. The Wyoming Supreme Court's decision, also available to the Defendant or any member of the public who views the Supreme Cour's website, further contradicts the published Article, stating:

a. "The district court did not ignore, but repeatedly acknowledged, Mother's steadfast and shocking efforts to denigrate Father and to destroy any relationship between D. and Father. **That she was largely successful in these efforts is heartbreaking**."

b. "**The district court found no evidence that Father had harmed D. other than mother's and D.'s questionable reports, and these had been determined unsubstantiated**." The Supreme Court noted that the child's former physician found "no physical marks, abrasions or contusions" despite Mother's claim that Father had kicked the child.

c. "The temporary order identified inappropriate coparenting conduct by Mother occurring from 2017 through 2019. This conduct included Mother's interference with communication between Father and [minor child]; filming videos of [minor child] disparaging Father and sending these to Father; coaching [minor child] in hat to say to Father; sending Father

numerous texts telling him he will never get custody; and sharing the details of the divorce with [minor child].   **The district court made clear that Mother's estrangement and alienation efforts were to stop immediately**."

d.  "Dr. Shievold's final recommendation was **that [minor child] be removed immediately from Mother's care and that Mother receive 'intensive therapy around her problems with exaggerations and mis-perceptions of facts**, her problems with dysregulation of emotions, her enmeshment with [minor child] and her projection of rage associated with feelings of abandonment and emotional abuse by Father onto [minor child]."[1]

C. **Malice and Willful Disregard.**

13. At no time prior to the publication of the Article did the JH News make any effort to contact Plaintiff to seek comment, a response, or to verify the inflammatory and defamatory statements.

14. The Defendant also failed to review criminal records, which would have revealed the non-existence of any charges, prosecution, or conviction against the Plaintiff for the alleged act of strangulation. Such a review would have directly contradicted the defamatory claim that Plaintiff "strangled me within inches of my life" and significantly undermined their "sources".

15. The Defendant's decision to publish the defamatory Article, despite having knowledge of the public court records, demonstrates a striking lack of professional due regard for the truth and a conscious indifference to the substantial harm it would inflict upon the Plaintiff. The publication recklessly printed a statement as fact, identifying "Mecartney's father, his abuser..." without attributing the claim to

---

[1] "Mother and Father stipulated to the appointment of a custody evaluation, Dr. Arnold Shievold."

anyone. Based on the information available to them, the Defendant acted with

malice and a willful and wanton disregard for the truth.

16. On May 23, 2025, Plaintiff sent a letter to Defendant Jackson Hole News And

Guide, the contents of which included the following:

>Subject: Dune Mecartney Article May 21, 2025
>
>Jackson Hole News & Guide
>Attn: Ms. Hall
>Re: Article Published on May 21, 2025 Regarding Dune
>Mecartney
>
>Dear Ms. Hall,
>
>I am writing in response to the article published on May
>21, 2025, which includes the statement, "Mecartney's
>father, his abuser." This assertion is factually incorrect
>and has caused significant harm to my personal and
>professional reputation.
>
>Contrary to what was reported, I am not the abuser. The
>truth is far more complex and deeply documented.
>According to the custody evaluator appointed by the
>court, the abuse and emotional instability stem from the
>mother, who the evaluator noted may suffer from a
>personality disorder. His findings included traits of
>narcissism, borderline personality, obsessive-
>compulsive features, emotional dysregulation, and
>volatility. As stated in court testimony:
>
>"The custody evaluator opined that Mother could have
>a personality disorder... He opined that her histrionics
>are based in her desire to both be in control and appear
>to be in control." (Tr. at 335–336)
>
>More importantly, Judge Day's conclusions in the
>custody order directly contradict your article's claim:

"The Court finds that no substantiated evidence of child abuse by Father was proven at trial." "After considering all the evidence of abuse, the Court is not able to conclude there was spousal abuse…"

Additionally, a report by the Department of Family Services (DFS) found no grounds for action. My son was regularly seen by mandatory reporters throughout this time, none of whom found cause for concern or intervention.

I have attached several supporting documents for your review:

1. "Bird" Video [*link was provided in letter, but here it has been redacted due to depicting a minor child*]
2. "Mommy Dearest" Video [*link was provided in letter, but here it has been redacted due to depicting minor child*]
3. Custody Order Highlighted
4. DFS Report

These materials provide a clearer picture of the situation and may be useful in setting the record straight. I am disappointed that no effort was made to contact me for comment prior to publication. I believe a responsible and ethical approach to journalism requires hearing all sides, especially in sensitive matters involving family and legal issues.

I respectfully request that the News & Guide issue a correction and clarify the record. I am available to speak further and provide additional documentation if needed. Please feel free to contact me at your convenience, and I ask that you respond to this letter within 7 days.

Sincerely, David Mecartney

[*telephone number in original, but redacted here for privacy*]

CC: Adam Meyer, Publisher.
Johanna Love, Editor in Chief.

Billy Arnold, Managing Editor.
Jim Stanford, Assistant Editor.
Sarah Sellergren, Copy Editor.
Pamela Periconi, Managing Editor.
Kevin Olson, CEO.

17. The Defendant never responded to the Plaintiff's letter, which provided a clear summary of the court's findings and supporting documentation, including the Custody Order and a DFS report.

18. Instead of issuing a proper retraction, they published a grossly insufficient "update" that merely stated the Plaintiff "denied allegations he abused his family" and that the parents were "still in court after 10 years of litigation". This created a false impression of ongoing culpability and implied the court record supported the claims of abuse.

19. The update further exacerbated the defamation by adding, "Mecartney said his father was his abuser and that he and his mother said they are both survivors of domestic violence and child abuse," thereby republishing the defamatory statements.

20. Neither attributing the statements to Mecartney nor the subsequent "updates" to the article absolve JH News from liability. According to the Restatement (Second) of Torts § 578, anyone who repeats or republishes defamatory content is subject to the same liability as the original publisher, with the exception of those who merely deliver or transmit the defamation.

21. The Defendants' malicious conduct was further underscored by their failure to correct or update the original post on the Jackson Hole News & Guide Instagram account related to the Article. As of October 11, 2025, the defamatory post remained uncorrected.

22. This choice ensured the continued dissemination of false statements, demonstrating a conscious indifference to the substantial harm it would inflict upon the Plaintiff.



23.

24. The Defendant's conduct demonstrates a profound level of malice, outrage, and willful and wanton disregard for the truth and for the impact the defamatory

statements would have on the Plaintiff. This behavior goes far beyond mere negligence, demonstrating a conscious and deliberate course of conduct that has caused significant and ongoing harm.

25. The Defendant's malicious intent is evident in their actions, beginning with the initial publication. The original article recklessly printed a defamatory statement as fact, a conscious act of disregard for the truth. The Defendant was fully aware of public court documents, yet they intentionally ignored crucial details from those records. These documents evidenced that the trial judge found no substantiated abuse and repeatedly questioned the Mother's credibility. The court even concluded that the Mother, not the Father, was at fault for alienating the child from his father.

26. The Defendants then compounded their initial misconduct by refusing to meaningfully correct the record. They failed to remove or correct the defamatory Instagram post that falsely labeled the Plaintiff as an "abuser," ensuring it remained publicly accessible. As of October 11, 2025, the post remained uncorrected and had garnered 302 "hearts", 7 "comments" and 24 "shares".[1] This continued public endorsement of a false accusation demonstrates a shocking indifference to the real-world harm caused by their reporting. It subjects the Plaintiff to a constant and painful reminder of the malicious and untrue statements, causing him severe and ongoing emotional distress.

27. The original defamatory publication immediately and irrevocably damaged the Plaintiff's reputation. The tangible harm is evidenced by a text message the Plaintiff received at 6:53 AM on May 22, 2025:

> Hate to be the bearer of bad news but though you will need to confront people at some point and get your side of the story out. Yesterday in the Jackson newspaper there was an article featuring dune. He said some pretty awful things. And I know some of the back story so don't believe it all but there will be people who do. Just thought you should know. I am so sorry to be the bearer of bad news.

28. The Defendants' egregious conduct did not end with the initial publication. Approximately 90 days later, on August 20, 2025, with full knowledge of crucial contradictory facts, the Defendants compounded their malice.

29. On August 20, 2025, JH News made a deliberate choice to reinforce the defamatory narrative and published a second article, "Jackson Hole's newest Eagles celebrated," featuring a prominent photograph of Dune Mecartney. The article highlighted his Eagle Scout project, stating, "For his Eagle scout project, Mecartney founded an organization called Safe Kids U.S., which gives children across the country advice and information about laws and resources to identify, report and escape abuse".

30. This was not merely a poor editorial decision; it was a continuation of the publication's malicious campaign against the Plaintiff. By reporting on a project so directly tied to the subject of "abuse," JH News intentionally and irresponsibly reinforced the defamatory narrative, without any qualifying language or effort to

correct the record. The article's content and placement directly lent credence to the initial falsehood, solidifying a false public perception and further damaging the Plaintiff's reputation.

D. **Malice and Willful and Wanton Disregard for the Truth Warrant Punitive Damages.**

31. The Defendant's actions demonstrate a profound level of aggravation, outrage, malice, and willful and wanton misconduct, which is ripe for a punitive damages award. This conduct is not merely a matter of negligence but a calculated and conscious disregard for the truth and the severe harm inflicted upon the Plaintiff.

32. The Defendant's willful misconduct is demonstrated by a series of calculated decisions. Although aware of publicly available court documents that explicitly and repeatedly found the abuse claims to be unsubstantiated, undermined the credibility of their key source, and presented a completely different account, the Defendant chose, instead, to recklessly publish a defamatory article falsely labeling the Plaintiff as an "abuser." This reckless disregard for the truth was compounded by the Defendant's failure to contact the Plaintiff for comment prior to publication, a fundamental tenet of responsible journalism.

33. Second, the Defendant's malicious intent was further demonstrated by its inadequate and misleading response to the Plaintiff's formal demand for a correction and clarification. Rather than correcting the record with the verifiable court findings, the Defendant issued a grossly insufficient "update" that obscured the truth and implicitly reinforced the false narrative. Furthermore, the Defendant's

failure to correct the defamatory post on its Instagram account further ensured the continued dissemination of the false statements to a broad audience.

34. Finally, the Defendant deliberately amplified the defamatory narrative by publishing a second article that highlighted the child's project on "abuse." This act, months after the initial publication and with full knowledge of the Plaintiff's denials and the contradictory court records, was a calculated move to reinforce a harmful and false public perception. Each of these actions, from the initial reckless publication to the refusal to correct the record and the subsequent amplification of the defamatory claims, constitutes a pattern of behavior that rises to the level of malice and willful and wanton disregard for the truth.

35. **Warren Buffett** incisively captured the profound and lasting harm of losing one's reputation when he stated:

> **"Lose money and I will forgive you. Lose even a shred of reputation, and I will be ruthless. Wealth can always be recreated, but reputation takes a lifetime to build and often only a moment to destroy."**

This quote powerfully underscores that while **wealth** is transient and recoverable, **reputation** is a fragile, lifelong asset whose destruction warrants zero tolerance.

36. JH News's choice to title their article, "Words Are Power," concedes the central point of this lawsuit. This very phrase proves Plaintiff's claim that the devastating impact of their defamatory words was both foreseeable and a direct result of the Defendants' misuse of that power.

16

## **Count I - Defamation Per Se**

37. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

38. At all times relevant, Plaintiff was a private figure. However, the Defendant's actions satisfy the heightened "actual malice" standard.

39. On May 21, 2025, JH News published a defamatory article that falsely identified the Plaintiff as "Mecartney's father, his abuser..." and other inflammatory statements. On August 20, 2025, the Defendant published a second article that maliciously reinforced this defamatory narrative.

40. The false and malicious statements published by Defendant accused Plaintiff of committing criminal offenses, namely child abuse and domestic violence. This constitutes defamation per se under Wyoming law, which presumes damages without a requirement to prove special damages.

41. The Defendant acted with actual malice and reckless disregard for the truth, as they were aware of court documents that explicitly and repeatedly contradicted the allegations of abuse and absolved the Plaintiff.

42. As a direct and proximate result of the Defendant's conduct, the Plaintiff has been subjected to hatred, contempt, ridicule, and scorn. The publications have severely injured his reputation, diminishing the esteem, respect, goodwill, and confidence in which he is held within his community and professional life.

43. Due to the defamation per se, Plaintiff is entitled to presumed damages for the harm to his reputation and standing.

44. As a direct and proximate result of the Defendant's defamatory publications, Plaintiff has suffered significant special damages, including specific economic losses.

45. The Plaintiff has had a distinguished career in aviation management spanning over forty years, building a small company with seven employees into an international "gold standard" with over 150 employees. His career represents a lifetime of professional achievement, expertise, and a sterling reputation in a specialized and highly regulated industry that demands absolute trust and confidence from clients.

46. Before the Defendant's defamatory actions, Plaintiff intended to continue leveraging his expertise through consulting and business development. However, the false and malicious assertions of "child abuse" and "domestic violence" have caused substantial and quantifiable harm to his professional standing and income. This harm includes, but is not limited to, tangible losses related to client retention and client acquisition, as the defamatory statements have made it nearly impossible for the Plaintiff to maintain or secure professional relationships. These professional injuries are directly traceable to the Defendant's publications and constitute pecuniary losses for which Plaintiff seeks full compensation.

47. The Defendant's conduct demonstrates a profound level of aggravation, outrage, malice, and willful and wanton misconduct, warranting an award of punitive damages.

48. The Defendant's malicious intent is evidenced by a series of calculated decisions, including:

1. Publishing the defamatory statements in the free version of their newspaper on what is believed to be the day with the highest readership, thereby maximizing public exposure and dissemination of the defamatory content.

2. Intentionally disregarding and failing to disclose crucial details from publicly available court documents that directly contradicted the abuse allegations.

3. Restating and affirming the underlying defamatory statement in their "update" when they stated "Mecartney said his father was his abuser and that he and his mother said they are both survivors of domestic violence and child abuse."

4. Publishing a second article that, with full knowledge of the Plaintiff's denials and the contradictory court records, maliciously reinforced the defamatory narrative.

49. These actions demonstrate a conscious indifference to the veracity of their reporting and the foreseeable, severe harm to the Plaintiff's reputation. Plaintiff is entitled to a punitive damages award sufficient to punish the Defendant and deter similar future misconduct.

## **Count II - Negligent Infliction of Emotional Distress**

50. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

51. The Defendant, JH News, owed a duty to the Plaintiff and the public to exercise reasonable care in its reporting and publication, particularly when disseminating highly sensitive and personal information. This duty required the Defendant to verify facts, seek comment from all parties, and avoid publishing false and injurious statements.

52. The Defendant breached this duty through its reckless and negligent conduct, including:

   1. a. Publishing an article on May 21, 2025, that contained a false and defamatory statement identifying the Plaintiff as an "abuser" without any effort to verify the claim.

   2. b. Publishing a grossly inadequate "update" on May 28, 2025, which was not a correction but a further obfuscation of the truth, implicitly reinforcing the false narrative.

   3. c. Publishing a second article on August 20, 2025, that, by highlighting a child abuse prevention project, maliciously reinforced the original defamatory statements and caused additional harm.

   4. d. Failing to contact the Plaintiff for comment or a statement prior to publishing either article, despite the gravity of the allegations.

53. As a direct and proximate result of the Defendant's negligence, the Plaintiff has suffered severe and debilitating emotional distress, including humiliation, anxiety, and an inability to engage in normal social activities. This emotional distress is of a severity that no reasonable person could be expected to endure.

54. The Plaintiff is entitled to damages to compensate him for the injuries he has sustained as a direct result of the Defendant's negligence.

## **DAMAGES**

55. As a direct and proximate cause of the acts and omissions of Defendant, JH News, Plaintiff has suffered significant damages. As a consequence of these injuries, the Plaintiff has sustained the following damages:

56. **General Damages**: To compensate for the severe and presumed harm to Plaintiff's reputation, public standing, and the severe emotional distress, humiliation, and scorn he has endured.

57. **Punitive Damages**: To punish the Defendant for its outrageous, willful, and wanton misconduct, and to deter similar behavior in the future. The Defendant acted with actual malice and a reckless disregard for the truth by knowingly publishing false and defamatory statements and refusing to correct the record, even with evidence that exonerated the Plaintiff.

58. **Nominal Damages**: To acknowledge the legal injury inflicted upon the Plaintiff by the Defendant's wrongful conduct.

## **PRAYER FOR RELIEF**

59. WHEREFORE, Plaintiff prays for judgment in his favor as against Defendant, JH News, for no less than $25 million together with the costs of this action, and for such other and further relief as this Court deems just and proper in the premises.

## **DEMAND FOR JURY TRIAL**

60. Plaintiff hereby demands a trial by a jury of twelve (12).


Dated this 2nd day of December 2025.       *Jason Edward Ochs*

_____

Jason Edward Ochs, WSB: 7-4965
Ochs Law Firm PC
4305 Balsam Lane
PO Box 10944
Jackson, WY  83001
T: 307-234-3239
F: 307-235-6910
Jason@ochslawfirm.com

*Attorney for Plaintiff David Mecartney*